## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 25-CR-127-BAH |
| | : | |
| v. | : | |
| | : | |
| STEPHAN FREEMAN, | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S MEMORANDUM IN RESPONSE TO DEFENSE'S EMERGENCY MOTION FOR REVIEW AND MEMORANDUM IN SUPPORT OF PRETRIAL RELEASE

The United States respectfully submits this memorandum in response to defense's emergency motion for review and memorandum in support of pretrial release, and asks that the Court deny defense's motion and order that the defendant be detained pending trial under 18 U.S.C. § 3142(d)(1)(A)(iii) (defendant on probation or parole) and 18 U.S.C. § 3142(f)(1)(E) (felony involving possession of a firearm), as the defendant, Stephan Freeman, is charged with violating 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm). The evidence presented to the Court shows that the defendant poses a demonstrated danger to the public and is a flight risk if he is released. As described below, all four statutory factors in § 3142(g) strongly favor pretrial detention.

### I.    Factual and Procedural History

On April 21, 2025, members of the Metropolitan Police Department's (MPD) Robbery Suppression Unit (RSU) on patrol on the 5000 Block of C Street SE, Washington, D.C. 20019. At around 5:36 PM, RSU officers observed Joshua Gulliver, a third unidentified individual, and the defendant, Stephan Freeman (hereinafter referenced as Freeman), in or around a Gold Lexus SUV with Maryland tag 5GKXXXX (hereinafter referenced as gold Lexus SUV). The unidentified individual was sitting in the passenger seat while Gulliver was standing outside the gold Lexus

1

SUV.  Freeman was standing between the driver's side door and seat with full access to inside the vehicle.  *See Figure 1.*  Officers observed Gulliver smoking a marijuana cigarette on the public street.   Officers approached the men and the unidentified individual in the passenger seat immediately exited the gold Lexus SUV.  At that point, none of the men were handcuffed or detained.

During the officers' conversation with Gulliver, another officer observed a red plastic cup with a brown liquid in the center console, *see Figure 2, 3*, and a bottle of [open] bourbon whiskey behind the driver's seat in plain view.  *See Figure 4.*  When asked whether he had been drinking, Freeman responded by informing officers that the drink was from the other day.   Freeman identified the car to be his and a check of law enforcement databases reflected that the car was registered to his sibling.  Officers arrested Freeman for possession of an open container of alcohol.  All three men were then handcuffed, and the officers searched the vehicle incident to arrest.



***Figure 1: FREEMAN in between the driver's side door and seat, unidentified individual next to FREEMAN, and unidentified individual in the passenger's seat***



*Figure 2: Plastic Cup with Brown Liquor (indicated with red arrow)*



*Figure 3: Brown Liquor in Plastic Cup*



***Figure 4: Bottle of Bourbon Whiskey in Car***

During the search, officers found a black backpack with a green interior on the floor of the driver's side where Freeman had been standing when officers arrived. The black backpack contained a black semi-automatic pistol Ruger Model 9E 9-millimeter with a serial number of 335-84819. *See Figures 5, 6.* There were sixteen rounds of ammunition inside a large capacity feeding device (holds up to seventeen rounds) found inside the firearm with one round in the chamber. *See Figures 7, 8.* A check of law enforcement databases reflected that the firearm was stolen from South Fulton, Atlanta, Georgia. The officers also found multiple credit cards and an identification card from the Anne Arundel Detention Facility, all in Freeman's name, inside the backpack. *See Figure 8, 9.*



*Figure 5: Firearm Found in Black Backpack*



*Figure 6: Serial Number of Firearm*



*Figure 7: Firearm, Ammunition, and Magazine Recovered*



*Figure 8: Ammunition in the Magazine*



*Figure 9: Opened Black Backpack with Green Interior and Credit Cards in FREEMAN's Name.*



*Figure 10: Anne Arundel County Detention Facility Identification in FREEMAN's name (date of birth redacted).*

Officers determined that Freeman did not have a license to carry or own a gun in Washington, D.C.  There are no firearms or ammunition manufactured within the District of Columbia and, therefore, the recovered firearm and ammunition traveled in and affected interstate commerce.  Freeman was previously convicted of Transporting a Handgun on a Roadway in Prince George's County, Maryland on July 2, 2017 in case number CT161243A and sentenced to three years confinement with three years suspended.  Freeman was then convicted on August 23, 2019, under CT181418B of Conspiracy to Commit Robbery in Prince George's County, Maryland, and sentenced to fifteen years imprisonment with thirteen years, six months suspended, and three years' supervised probation.  Freeman was also convicted on August 23, 2019, in case number CT181185X of Illegal Possession of a Firearm in Seat Pleasant, Maryland, and was sentenced to five years confinement with three years, six months suspended, and three years' supervised probation.  Accordingly, Freeman would have been aware that he was previously convicted of a crime punishable by a term of imprisonment exceeding one year at the time he possessed this firearm and ammunition.

### The May 2nd Detention Hearing

The Government wrote a written filing in advance of the hearing.  Prior to the hearing, the Government provided defense counsel with video and images from body-worn camera.  The Government's written filing included images—and screenshot images taken from body-worn camera—that portrayed the scene and arrest.  Both parties offered argument.

Judge Moxila Upadhyaya found that the Government met its burden that the defendant, if released, would be a danger to the community by clear and convincing evidence.[1]  Judge Upadhyaya found that the nature and the circumstances weighed in favor of detention because the

---

[1] Judge Upadhyaya found that the government had not met its burden that the defendant would be a flight risk by a preponderance of the evidence.  The risk of flight is not the basis for the government's motion.

stolen, high-capacity firearm was found unsecured, easily accessible to the defendant, and in a residential area.  She also found that the weight of the evidence weighed in favor of detention because of the images provided in the Government's written filing and a grand jury returning an indictment against the defendant proved that the weight of the evidence was strong.

Judge Upadhyaya similarly found that the history and characteristics of the defendant, and the nature and seriousness of the danger to any person or community weighed heavily in favor of detention.  As for the history and characteristics, Judge Upadhyaya stressed that the defendant had two other firearm convictions.  More saliently, Judge Upadhyaya found that the details of the defendant's civil protective order (CPO)—along with his signature following two separate warnings that required him to relinquish any currently and held firearms and prohibited him from possessing firearms in the future—warranted detention.  *See* ECF No. 12 at 3, 10.  Although the Judge Upadhyaya discussed the CPO at length and read it into the record at the hearing, she expressed concerns about releasing the defendant even prior to reading the details of the CPO.

Moreover, Judge Upadhyaya found that the defendant's inability to successfully complete any probationary period and his recent behavior regarding his CPO showed his dangerousness to the community.  Judge Upadhyaya acknowledged that the defense was correct that probation may be closed unsatisfactorily for a myriad of reasons—many being administrative—but she highlighted that the defendant's first probation was revoked due to criminal charges that amounted to the following two conviction.  Judge Upadhyaya found that the defendant's very recent noncompliance and adversarial behavior towards the court regarding his CPO, resulting in a bench warrant that was not executed until he was arrested pursuant to this current charge, proved that he was incapable of following court orders and was a danger to the community.

Based on a thorough consideration of all four factors, and acknowledging the defendant's arguments in opposition, Judge Upadhyaya found that Freeman would present too great a danger to our community should he be released, and there are no conditions or combination of conditions that would assure the safety of community.

## II.    **Argument**

The Court reviews a Magistrate Judge's decision *de novo*. *See* LCrR 59.2(c). In determining whether to detain the defendant pending trial, the Court assesses the same four factors assessed by the Magistrate Judge under Section 3142(g), namely (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g). A review of the 3142(g) factors makes clear that no condition or combinations of conditions will assure the safety of the community if Mr. Freeman were to be released. In short, the Court should reach the same conclusion that Judge Upadhyaya did.

### 1.  **The Bail Reform Act Factors All Favor Detention**

The United States seeks detention pursuant to §§ 3142(d)(1)(A)(iii) (defendant on probation or parole) and 3142(f)(1)(E) (felony involving possession of a firearm). *See* PSR 1.

The Bail Reform Act, under 18 U.S.C. § 3142(g), enumerates four factors that the court should analyze in determining whether to detain the defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.

The weight of the evidence should be considered equally with the other § 3142 factors. For

example, in *United States v. Blackson*, this Court found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." No. 23-cr-25 (BAH), 2023 WL 1778194, at *8 (D.D.C. Feb. 6, 2023).  Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate."  *Id.* at *10; *aff'd,* No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023); *see also, United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022).  Each of these factors weigh in favor of pretrial detention in this case.  *See* 18 U.S.C. § 3142(g).

"[W]hen the Government proves by clear and convincing evidence that *an arrestee presents an identified and articulable threat to an individual or the community*, . . . a court may disable the arrestee from executing that threat. . . ."  *United States v. Munchel*, 991 F.3d 1273, 1282-83 (D.C. Cir. 2021) (quoting *Salerno*, 481 U.S. at 751) (emphasis added).  The government has met this burden.  The defendant carried an unsecure, stolen, high-capacity, semi-automatic firearm in the presence of children.  The defendant has multiple convictions and arrests involving firearms, and he indisputably knew it was unlawful for him to carry a firearm.  He possessed a firearm in violation of an active civil protective order that highlights some of his past dangerous behavior, which again, notably, was in the presence of children.  The defendant has an extensive, and current, history of violating court orders.  The defendant presents an identifiable and articulable threat to this community.

A review and understanding of the facts and circumstances in this case should lead the Court to affirm Judge Upadhyaya's decision and conclude that there are no conditions or combination of conditions that would assure the safety of the community.  *See* § 3142(e)(1).

### A.  The Nature and Circumstances of this Offense Merits Detention.

The first factor to be considered is the nature and circumstances of the offense charged. This factor weighs in favor of detention.  The defendant is charged with unlawfully possessing a loaded, stolen semi-automatic firearm—a serious crime that carries up to fifteen years in prison under § 924(a)(8).  While not formally defined as a crime of violence under the Bail Reform Act, this Court has recognized the nature of this crime is dangerous to the public.  *See, e.g.*, *United States v. Gassaway*, No. 21-CR-550 (RCL), 2021 WL 4206616, at *3 (D.D.C. Sept. 16, 2021) (collecting cases in this district holding that unlawful firearm possession is dangerous to the public); *United States v. Howard*, No. 20-MJ-181 (BAH), 2020 WL 5642288, at *2–3 (D.D.C. Sept. 21, 2020) (making same observation); *United States v. Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020) (noting that a loaded firearm "has the great potential to escalate into violence").

The defense argued that the government did not meet its burden because it did not allege, among other things, that the defendant "used or brandished the firearm, or even carried the firearm."  ECF 12 at 7.  This Court has warned against discounting the inherent danger associated with loaded firearms in holding that "the absence of such evidence does little to detract from the existing facts about the condition of the firearm." *Blackson*, 2023 WL 1778194, at *7-8.

The defendant possessed a stolen, fully loaded, high-capacity firearm in the Marshall Heights Neighborhood—a residential neighborhood.  This street is lined with single family homes, row houses, and apartment complexes.  Children and families frequent this area, and in fact children's voices can be heard on the body worn camera footage.

This firearm was not securely or safely stored in a gun locker or even in the car's glove box.  This firearm was loosely placed inside of a backpack found on the floor of the driver's side where the defendant had full access at the time the officers arrived.  Further, it appears that the

defendant may have been drinking while in possession of this firearm as there was alcohol in a plastic cup in the center console of the vehicle. Increasing the likelihood that he, or someone else, would make a rash and fatal decision with that illegal deadly weapon.

Here, the defendant had direct access to a stolen, loaded semi-automatic firearm that was freely stored in a backpack found on the floor of the driver's side seat where he was standing when officers arrived.

The first factor weighs in favor of detention.

### B. The Weight of the Evidence Against the Defendant is Strong.

The second factor to be considered is the weight of the evidence against the defendant. This factor also weighs in favor of detention. In the search incident to arrest, officers found a backpack on the floor of the driver's side where the defendant was standing when officers arrived. *See Figure 1.* Inside the backpack, was the stolen, loaded semiautomatic firearm along with identification and six cards all in the defendant's name. The defendant additionally told the officers that the gold Lexus SUV was his and—a law enforcement report showed that the vehicle was registered to the defendant's sibling. The defendant had full access and control over the backpack at the time officers arrived, and he, therefore, possessed the stolen, loaded semiautomatic firearm.

In addition to the defendant's criminal history which has three qualifying convictions under 922(g), the defendant's active civil protective order was signed by the defendant, just below two separate warnings that the defendant could not possess a firearm. *See* ECF 12 at 3. It is indisputable that the defendant knew that he was not lawfully able to carry a firearm.

Notably, a grand jury has since agreed, finding probable cause to support this arrest and returning an indictment against the defendant.

### C.  The Defendant's History and Characteristics Merit Detention.

The third factor to be considered is the history and characteristics of the defendant, which weighs heavily in favor of detention as the defendant has an extensive history of committing crimes involving firearms and violating the terms of his release.

The defendant's criminal history is stated in greater detail above.  The defendant has three felony convictions, two involving firearms, where he failed to satisfactorily complete his probation terms.  *See* PSR at 4-5.  The defendant was previously convicted of Transporting a Handgun on the Roadway in case number CT161243A. The defendant was also convicted of Illegal Possession of a Firearm in case number CT181185X, and Conspiracy to Commit Robbery in case number CT181418B.    The defendant was sentenced to three years confinement for Transporting a Handgun on the Roadway, fifteen years' confinement for Conspiracy to Commit Robbery, and five years confinement for Illegal Possession of a Firearm.  Probation for his first conviction was revoked and closed unsatisfactorily for the latter two convictions.  *See* PSR at 4-5.

The defendant also had two recent arrests in 2023 that involve firearms: Unlawful Possession of a Firearm in case number 23-CF2-000379 in D.C. Superior Court and Firearm Use in a Felony or Violence Crime, Handgun on Person, and Illegal Possession of a Firearm in Annapolis, MD in case number C-02-CR-23-000781.  *See* Ex. 1 at 4, 12-13.  In the D.C. Superior Court case, officers were responding to a call for domestic violence from the same woman who filed the CPO against him.  During the defendant's arrest, officers obtained and searched a black backpack with green material that belonged to the defendant where they found a handgun.  The defendant was also arrested in this case while on supervision for a civil protective order.  *See id.* Under this order, the defendant knew he was not allowed to possess firearms and was ordered to surrender all firearms in his possession. *See* ECF 13 at 10.

The defendant's dangerous history and characteristics are underscored by the defendant's civil protective order and his extremely recent noncompliant behavior while on supervision for that order. The addendum to the petition for the CPO describes violent, frightening, and erratic behavior by the defendant against his child's mother in front of his child. *See id.* at 3. This behavior included, among other things, choking and hitting the mother of his child. *See id.* The addendum to the CPO alone shows the defendant's dangerousness, but his behavior during the supervision under the CPO solidifies that there are no conditions that will assure the public's safety.

The CPO was active from August 14, 2023 until August 14, 2025, and resulted in a bench warrant on April 3, 2025. Prior to being placed on warrant status, the defendant was given special conditions requiring a domestic violence and family violence intervention program, mental health assessments, and mental health treatments. A January 17, 2025, Show Cause Hearing was continued after the defendant was "belligerent and refused to turn on the camera via Webex." PSR 4. In the continued hearing on February 4, 2025, the defendant refused to complete the court-ordered domestic violence conditions, requiring another continuance. The defendant then failed to appear *at all* for the twice-continued hearing on April 3, 2025, and a bench warrant was issued. But this was not all. When an officer finally made contact with the defendant via telephone with the defendant on April 8, 2025, (just two weeks before his arrest in the instant case), the defendant was noted to have ended the call laughing at the officer's instructions to report in person for his court hearing. The bench warrant was executed on April 22, 2025—the day after his arrest for this current charge and while he was in custody.[2] Notably, he was barred from having a firearm not

---

[2] In a conversation with Community Supervision Officer, Miriam Swann, Ms. Swann informed the government that the defendant was brought in front of the judge on April 22, 2025 pursuant to the bench warrant. He informed the judge that he was working in Baltimore and was providing financially for his child, so the judge removed the domestic violence program condition, but his current CPO is still in effect.

just by the conditions of his supervision and his felony conviction, but also based on the CPO entered against him.  *See id* at 4.

Here, a grand jury indicted the defendant for illegally possessing a dangerous, loaded firearm in a residential area on May 1, 2025, despite the fact that he was barred from having a firearm not just by his felony convictions.  And, as the defendant's arrest and conviction history makes clear, April 21, 2025 was far from the first time that he had unlawfully sought out and acquired firearms.  More troublingly, the defendant has so recently displayed that he is incapable of and uninterested in complying with court orders.  This Court should have no faith that he will follow any of the court's orders or appear for future hearings if released prior to trial.  In short, the defendant's combination of firearm convictions and utter disdain for even the simplest of court-ordered conditions makes the defendant's history and characteristics weigh heavily in favor of pretrial detention.

### D.  The Defendant Presents a Danger to the Community.

The fourth factor, the nature and seriousness of the danger to any person or the community posed by the defendant's release, similarly weighs heavily in favor of detention. The D.C. Circuit has noted that "'[w]hen the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community,'" pretrial detention is available to "'disable the arrestee from executing that threat.'" *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021) (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)). This requires the court to make a "forward looking determination" about the defendant's risk of danger to the community, keeping in mind that detention may be justified even if the court does not explicitly find that the defendant is a risk of committing acts of violence. *United States v. Hale-Cusanelli*, 3 F.4th 449, 456 (D.C. Cir. 2021) (citing *Munchel*, 991 F.3d at 1283).

Here, the defendant is clearly a threat to the community as evidenced by his recidivism and his failure to obey court orders. As noted above, the defendant has multiple convictions, two involving firearms: Transporting a Handgun on a Roadway, Illegal Possession of a Firearm, and Conspiracy to Commit Robbery. He understood that he was prohibited from carrying a firearm as he had previously been convicted of three crimes that came with a punishment for over a year and was under a Civil Protective Order that forbid him from possessing a firearm. Yet, he continued to carry a stolen, loaded, semiautomatic firearm in a backpack in a residential area in the presence of children.

The defendant presents a "significant danger to other persons to our community," as this Court stated in *Blackson*, because the defendant unlawfully possessed a "firearm that [was stolen, as opposed to] unregistered, with an extended capacity magazine, carried in a position of easy, quick access." 2023 WL 1778194, at *10. Possession of such a firearm represents a significant danger to the community. *See United States v. Washington*, 907 F. Supp. 476, 486 (D.D.C. 1995) ("[P]ossession by a felon of a fully loaded semi-automatic pistol suggests that the defendant presents an extreme safety risk to the public.").

The defendant's most recent behavior while on probation for his CPO is a perfect illustration of how he will treat any order from this Court and his danger to the community if released. It is clear that if released he will not follow any conditions put in place by this court. It is this factor, along with the other three factors, that weigh in favor of the defendant's detention pending trial to endure the safety of the community.

## 2.  **Defense's Statistics are Not Relevant in this Case**

The average metrics utilized by defense counsel: 1% FTA rate and 2% rearrest rate are not necessarily relevant in cases where defendants are charged with weapons offenses as these defendants are released less and commit misconduct more.[3] The Bureau of Justice Statistics within the United States Department of Justice reported that 27.5% of defendants with weapons charges received pretrial release compared to an average of 32.3% of defendants with any charge during FYs 2011-2018 (Table 3).  35.2% of defendants charged with weapons offenses violated conditions of pretrial release, 1.2% failed to appear, and 4.7% were rearrested (Table 7).  For all offenses, only 18.9% of defendants violated conditions of pretrial release, 1.0% failed to appear, and 2.1% were rearrested, placing defendants with weapons offenses above the average in each metric (Table 7).

These averages are brought down by the high rates of pretrial release and adherence to pretrial release conditions by defendants charged with offenses of a different nature.  72.7% of defendants charged with property offenses and 55.8% of defendants charged with public order offenses were granted pretrial release (Table 3).  After release, only 13.8% of defendants charged with property offenses and 12.7% of defendants with public order charges committed violations of the conditions of pretrial release, 0.9% and 0.7% failed to appear, and 1.8% and 1.1% were rearrested respectively (Table 7).

---

[3] Pretrial Release and Misconduct in Federal District Courts, Fiscal Years 2011-2018, U.S. DEP'T OF JUST., OFFICE OF JUSTICE PROGRAMS BUREAU OF JUSTICE STATISTICS (2022), https://bjs.ojp.gov/content/pub/pdf/prmfdcfy1118.pdf.

### 3.  A Third-Party Custodian Cannot Ensure the Safety of the Community

The government does not question the good faith of Freeman's mother.  But it is indisputable that Freeman's mother has not prevented him from obtaining and possessing firearms or violating court orders.  Moreover, the government is concerned that Freeman's mother does not have the distance or independence to be his supervisor, and essentially his jailer.  Freeman has been supervised by an established and professional organization which trains its officers and provides them resources to ensure supervisee compliance since his release from his first conviction in 2017.  Since then, he has been convicted of two more felonies, one related to firearms, arrested two more times for possessing firearms, and has failed to comply with conditions imposed under probation or by a CPO.

While courts have endorsed third-party custodians, such a custodian makes more sense where a defendant is young and willing to submit to an authority figure. *See United States v. Long*, 2020 WL 2434588 at \*2 (W.D. Pa.) ("An authority figure who enters the picture and takes charge of a young and unsophisticated offender provides greater protection to the community than does a third-party custodian who is essentially a peer (or spouse in this case) of the defendant, especially one who is socially affiliated with the defendant during the time the defendant is alleged to have committed very offenses charged.")  Freeman is not a child.  He is 31-years old.  There is no reason to believe that he is willing to submit to his mother's authority at this point where he has been unwilling to submit to the authority of officers.

Indeed, the challenge faced by third party custodians, who are essentially being asked to act like correctional officers twenty-four-hours a day for someone they care for deeply, has repeatedly been recognized by courts in this jurisdiction.  *See* Order (ECF No. 14), *United States v. Joyner*, 22-CR-252 (TNM) (D.D.C. Aug. 3, 2022) (reversing the magistrate court's order

releasing the defendant to a third-party custodian); Order (ECF No. 55), *United States v. Handy*, 22-CR-164 (RBW) (same), *aff'd*, Case No. 22-3045, D.C. Cir. (2022); Order, ECF 54, *United States v. Charles Cunningham*, 23-CR-7 (JMC) (D.D.C. March 13, 2023) ("third-party custodian, no matter how competent or dedicated, cannot stand in the shoes of the defendant. Nor should a third-party custodian be cast in the role of jailer…. Mr. Cunningham's custodians cannot supervise his behavior on a 24/7 basis."); Order, ECF 18, *United States v. Trevor Wright*, 22-CR-410 (CRC) (D.D.C. Dec. 23, 2022) ("family members are not correctional officers. Nor should they be expected to play that role"); Order, ECF 10, *United States v. Steffon Frazier*, 23-CR-255 (ABJ) (D.D.C. Sept. 18, 2023) (reversing magistrate judge's decision appointing a mother as a third-party custodian in a gun possession case).

Moreover, defense does not account for the fact that Freeman's mother has a work schedule that requires her to be away from the residence every day except for Thursdays and Fridays. Defense has not provided any indication who will supervise Freeman in her absence.

As this Court explained in *Blackson*: "a benefit of professional detention facilities is the consistency in insuring detention conditions. Defendant's ability to obtain a fully loaded and unregistered gun while on probation, despite the family support he enjoys, underscores that the best intentions and most valiant efforts of defendant's mother to fulfill all the proposed conditions provide no guarantee these conditions will be maintained to the letter for the duration, possibly many months, of defendant's pretrial proceedings." 2023 WL 1778194, at *12.

To convert Freeman's mother into his warden is simply not a viable or fair solution for keeping the community safe.

III.    **<u>Conclusion</u>**

For all the foregoing reasons, the government respectfully requests that the Court deny defense's motion for review of his release conditions.