UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 25-CR-127-BAH |
| | : | |
| v. | : | |
| | : | |
| STEPHAN FREEMAN, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SUPPLEMENTAL MEMORANDUM IN
OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**

The United States of America, by and through its attorneys, the United States Attorney for the District of Columbia, respectfully submits this supplemental memorandum in opposition to the defendant Stephan Freeman's (herein referred to as "Freeman" or the defendant) Motion to Suppress, filed at ECF No. 23 ("Def. Mot.") and as a supplement to the government's Opposition to the Motion to Suppress, filed at ECF No. 26 ("Gov't Mot.").

**ARGUMENT**

**I.     Freeman was Not Seized Until He was Detained by Officer Joseph for Possessing an Open Container of Alcohol.**

Freeman was not seized by officers until he was arrested for possessing an open container of alcohol in his vehicle. The brief interaction occurred during daylight hours and was focused on Gulliver who was standing next to Freeman. When police did address Freeman, it was in a calm, relaxed tone, and was not accusatory. And while there were approximately 8 officers on the scene, their arrangement focused on Gulliver, and did not block the front of Freeman's SUV. And while interacting with police, Freeman demonstrated his ability to go about his business by moving in and out of the SUV. Investigator Perez's request for identification cannot transform this otherwise consensual encounter into a stop.

**A.     The Extent of the Police's Presence Here Does Not Indicate Freeman Was Stopped.**

Law enforcement did not stop Freeman, because the focus of their interactions was on

Gulliver, they spoke in a calm and relaxed tone, and nobody commanded Freeman to do anything. Police's interaction on the scene from the moment Investigator Perez stepped out of his police cruiser, to when Officer Joseph placed him under arrest lasted approximately 1 minute and 28 seconds. (Gov't Ex. 1 at 17:32:20 – 17:33:48). As police approached Gulliver, Freeman, and Camara during daylight hours, they did so with a relaxed tone, and without any show of aggression or force. While there were approximately 8 officers and 3 police cruisers on the scene and near Freeman, up until the open container of alcohol was discovered, police's focus on the driver's side of the SUV was almost entirely focused on Gulliver. Two of the officers (Officers Joseph and Investigator Hinostroza) were on the passenger side interacting with Camara, and two were standing back on the driver's side observing. Investigator Perez was the only officer interacting with Freeman, and even then, his interactions were limited to asking Freeman for his identification, asking him whether he had been drinking, and informing him that there was an open container of alcohol in the car as Officer Joseph prepared to place him under arrest. And for a portion of that time, Investigator Perez's focus was on his own phone, not on Freeman. (Gov't Ex. 1 at 17:33:07 – 17:33:39). The number or arrangement of offices here was not so restrictive as to seize Freeman. *See United States v. Gray*, 2021 WL 2209462, at *7 (D.D.C. May 31, 2021) (no seizure when ten to twelve officers got out of three or four police cruisers in an alley during daylight hours and one officer interacted with the defendant (joined by another shortly thereafter), while other officers were speaking with others in another part of the alley).

Here, officers approached Gulliver, Freeman, and Camara at approximately 5:30 p.m. During the encounter, 4 of the 8 officers were either on the passenger side or standing back watching. No officer gave commands or aggressively spoke to Freeman. *See United States v. Gross*, 784 F.3d 784, 787 (D.C. Cir. 2015) (four officers wearing tactical vests and following the

defendant did not seize the defendant despite accusatory questioning about carrying a gun and showing his waistband). No one touched or physically restrained Freeman, nor did they draw their weapons. *See United States v. Goddard*, 491 F.3d 457, 461-62 (D.C. Cir. 2007) (four officers jumping out of cars with guns and handcuffs showing and wearing ID was not a seizure). Most of the officers on the driver's side remained on Gulliver's left, and focused on him. Gulliver was properly stopped because police saw him smoking marijuana. That Freeman happened to be near Gulliver while police interacted with him cannot by itself transform police's encounter with Freeman into a stop.

In addition, the position of the officers and their cars did not block Freeman's ability to leave. Two police cruisers pulled up alongside Gulliver, Freeman, and Camara in the middle of the street, and one brought up the rear. While the cars and officers were close to Freeman, there were no cars in front of Freeman's, and thus the front end of his SUV was unobstructed. *See Goddard*, 491 F3d at 461 ("[A]lthough the presence of a police car might be 'somewhat intimidating,' such police presence does not constitute a seizure where the officers did not use their siren or flashers, did not command the defendant to stop, did not display their weapons, and did not drive aggressively to block or control the defendant's movement." (citing *Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct. 1975, 569, 575 (1988)); *Gross*, 784 F.3d at 786 (no seizure when officers questioned the defendant in a car separated by one lane of traffic); *United States v. Person*, 754 F. Supp. 3d 231, 238-39 (D.D.C. 2024) (no seizure even when police blocked the defendant's car from leaving, because the defendant was not inside and still could have walked away); *Gray*, 2021 WL 2209462, at *7 (no seizure when police parked 25 feet away and did not block the defendant's car from leaving an alley). More is required to effectuate a seizure simply by the positioning of a police car. *See United States v. Delaney*, 955 F.3d 1077, 1083 (D.C. Cir.

2020) (holding the defendant was seized when police "parked their car approximately three feet away from a defendant sitting in the driver's seat of his parked vehicle in a dimly lit, narrow parking lot and shined their 'take-down light' at him").

### B. Law Enforcement Did Not Constrain Freeman in a Way Suggesting He Was Stopped.

A reasonable person is seized when police conduct communicates that the person is not at "liberty to ignore the police presence and go about his business." *See Delaney*, 955 F.3d at 1081 (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). As the evidence shows, Freeman went in and out of his car during the encounter in a way that would have been impermissible had he been stopped. Upon officers' arrival, Freeman was in between the car and the door. (Gov't Ex. 1A). When officers exited their vehicles, Freeman closed the door and locked the car, without anyone asking or commanding him to do so. (Gov't Ex. 1 at 17:32:20 – 17:32:30). While the police were talking with Gulliver, Freeman exclaimed that he was not doing anything, and smiled and laughed. (Gov't Ex. 1 at 17:32:35 - 17:32:43).

During the beginning of his interaction with police, Freeman freely reached into the passenger compartment of his car (on the driver's side, where the gun was recovered) to retrieve his phone. (Gov't Ex. 1 at 17:32:59 – 17:33:03). As Investigator Perez testified, a stopped individual would not have been permitted to move in and out of the vehicle in that way. (Suppression Tr. at 17:17-25). Indeed, this type of movement can be extremely dangerous for law enforcement. *See United States v. Bell*, 480 U.S. 860, 864 (8th Cir. 2007) (a defendant reaching around the vehicle may provide a reasonable basis for officers to believe the defendant was armed and dangerous (citing *Michigan v. Long*, 463 U.S. 1032, 1047-49 (1983)); *United States v. Hughes*, 995 F.2d 305 (Table), at *1 (D.C. Cir. 1993) (unpublished) (holding that the defendant's "forward leaning motion in the car's front seat" and "subsequent 'fidgety' behavior" was reason to think the

defendant was "armed and dangerous, 'and it was necessary for the protection of himself and others to take swift measures to discover the true facts and neutralize the threat of harm if it materialized'" (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

### C. Requesting Identification Does Not Transform a Consensual Encounter into a Stop.

Investigator Perez's request for Freeman's identification cannot transform an otherwise consensual encounter into a stop. Here, Investigator Perez asked Freeman for his identification at most two times. When first getting out of his cruiser, Investigator Perez said to Gulliver, "I know we just saw you man," (referring to his smoking marijuana) and then asked "you got your ID?" (Gov't Ex. 1 at 17:32:21 – 17:32:25). Both Gulliver and Freeman responded, Gulliver said that he did not have his, but that he lived across the street, while the defendant makes an indiscernible remark about identification. (Gov't Ex. 1 at 17:32:25 – 17:32:28). To the extent Freeman interpreted Investigator Perez's request as being directed at him, Freeman apparently did not feel compelled to immediately find his identification. Approximately 30 seconds later, Freeman remarked that he has his identification on his phone and reached into the passenger compartment to retrieve his cell phone. He stared at his phone for approximately twelve seconds, tapped the screen one time, then put the phone in his pocket. (Gov't Ex. 1 at 17:32:57 – 17:33:22). Freeman did not appear to swipe, scroll, or even unlock his phone, apparently feeling no pressure to locate a picture of his identification. Investigator Perez then asked whether Freeman had a picture of his identification on his phone. Freeman responded, "oh yeah," and then pulled his phone out and scrolled repeatedly until Officer Joseph and Investigator Hinostroza announced there was an open bottle in the car. (Gov't Ex. 1 at 17:32:21-17:33:28). Ultimately, Freeman never produced identification.

The defendant contends that he was stopped because Investigator Perez asked for his

5

identification twice. But officers asking a person for their identification does not make an encounter a stop. *See United States v. Drayton*, 536 U.S. 194, 201 (2002) ("Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means." (citing *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991)); *United States v. Castellanos*, 731 F.2d 979, 983 (D.C. Cir. 1984) (affirming the denial of suppression when a park police officer approached the defendant while another officer stood at the rear of the car and asked the defendant for his identification); *United States v. Jordan*, 958 F.2d 1085, 1087 (D.C. Cir. 1992) (a stop does not occur when officers ask for identification until officers had a reasonable opportunity to review and has not returned the identification); *United States v. Tavolacci*, 895 F.2d 1423, 1426 (D.C. Cir. 1990) ("[W]e cannot find a seizure merely because the officers asked for an ID after obtaining [the defendant's] ticket."); *United States v. Howard*, 66 F.4th 33, 42-43 (1st Cir. 2023) (holding that police trooper's running identification checks at a crash site did not constitute a stop because the trooper did not demand the defendant speak with her and the defendant moved about the crash site before interacting with the trooper); *United States v. Collis*, 766 F.2d 219 (6th Cir. 1985) (per curium) (no seizure where police request identification while retaining documentation and further questioning). Even assuming Freeman interpreted Investigator Perez's initial request for identification as being directed towards him, neither of Investigator Perez's requests transformed this encounter into a stop. Investigator Perez's tone was calm and not aggressive. He also did not press Freeman for ID, he did not ask any other questions or make any commands, and after the first request he was on his phone during the majority of the interaction, not focused on Freeman. Investigator Perez's actions, therefore, do not suggest a reasonable, innocent person would not have felt free to leave.

\* \* \*

This was a calm and composed encounter. None of the officers' conduct communicated that they were exercising their official authority to restrain Freeman's movement, and Freeman's behavior established that he felt free to go about his business while police were there. There is no reason to suppress any evidence based on this encounter because Freeman was not stopped until he was lawfully arrested for illegally posing an open container of alcohol.

**II.     Officer Joseph Saw an Open Bottle of Wild Turkey Alcohol in the Backseat.**

Here, Officer Joseph saw an open bottle of Wild Turkey alcohol in the backseat of the vehicle in plain view. Officer Joseph testified that when looking through the passenger windows using his flashlight, he spotted the top of a bottle that was consistent with a liquor bottle that contained whiskey. (Suppression Tr. at 64:9-65:8). The bottle was standing up and leaning diagonally with the top towards the opposing window (on the driver's side). (Suppression Tr. at 72:9-17). Officer Joseph also testified that he observed negative space in the bottle, indicating that the bottle was not full and had previously been opened. (Suppression Tr. at 65:19-23). He immediately signaled to other officers that there was an open bottle of alcohol in the vehicle. (Gov't Ex. 3 at 17:33:21). This testimony went virtually uncontested on cross-examination.

The Court should credit Officer Joseph's testimony. As depicted below, Sergeant Welsh's body-worn camera shows how the bottle was positioned inside of the car before it was searched, which is consistent with Officer Joseph's testimony that the bottle was slanted towards the driver's side. (Def.'s Ex. 3 at 17:32:54).



From the opposite side of the SUV, Officer Joseph had a superior vantage point of the bottle, as depicted below. (Gov't Ex. 3 at 17:34:18). And using his flashlight to illuminate the interior, Officer Joseph was able to see the middle to the lower part of the bottle as it lay diagonally towards the driver's side of the SUV. (Suppression Tr. at 72:9-20).



After seeing the open container, Officer Joseph detained Freeman for possession of an open container of alcohol. When Officer Joseph recovered the bottle, it was in the same position he described. (Gov't Ex. 3 at 17:34:18). There is no reason to doubt Officer Joseph's testimony as his account is corroborated by the documentary evidence and was virtually uncontested on cross-examination.

### III. The Search of Freemans Backpack on the Front Driver's Floorboard Was a Lawful Search Incident to Arrest.

Here, Officer Hinostroza's initial search following the defendant's arrest was a bag on the floorboard of the driver's seat. (*Compare* Gov't Ex. 1 at 17:33:48 – 17:33:55 (Freeman is placed under arrest), *with* Gov't Ex. 2 at 17:33:45 – 17:34:01 (Hinostroza is the first officer in the SUV

9

and promptly searches Freeman's backpack where the gun is found)).  The search of the interior of Freeman's SUV was reasonable given Investigator Perez's and Officer Joseph's extensive experience investigating the illegal possession of an open container of alcohol in a car, and their regular recovery of additional evidence, including in bags.  (Suppression Tr. at 5:10-15, 27:14-21, 59:2-7, 69:8-25).  And indeed, the officers did find an additional bottle of alcohol when searching Freeman's SUV.  (Suppression Tr. at 32:12-18).

But the Court need not consider whether a search of Freeman's entire vehicle was justified, because the evidence he seeks to suppress was found at the outset of the search.  In other words, even if the search of the entire car surpassed the lawful scope of a search incident to arrest, the evidence should still not be suppressed because there is no causal connection between any search beyond the initial search of Freeman's backpack and the recovered evidence.  *See Hudson v. Michigan*, 547 U.S. 586, 592 (2006) (holding than an illegal entry in executing a search warrant did not warrant suppression in-part because "the constitutional violation of an illegal *manner* of entry was *not* a but-for cause of obtaining the evidence. Whether that preliminary misstep had occurred *or not,* the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house.").

Here, the search of the backpack found on the floorboard of the driver's seat was lawful because it was reasonable for officers to believe that the backpack could contain more evidence of possessing an open container of alcohol.  A search of a vehicle incident to arrest is justified when there is reasonable suspicion to believe that evidence of the offense might be found in the vehicle including any containers therein.  *Arizona v. Gant*, 556 U.S. 332, 344 (2009).  Based on Investigator Perez's and Officer Joseph's testimony, it was common to find additional containers of alcohol in the passenger compartment of a vehicle, to include bags.  (Suppression Tr. at 27:14-

10

21, 69:8-25); *see also Ornelas v. United States*, 517 U.S. 690, 700 (1996) ("[A] police officer may draw inferences based on his own experience in deciding whether probable cause exists."). Thus, it is reasonable to suspect that there would be further evidence of the possession of an open container of alcohol in a backpack found on the floorboard of the driver's seat, as it would not be unusual to carry bottles of alcohol in a backpack. Indeed, many Courts have previously upheld searches of vehicles where officers had probable cause—a higher standard than required here—that more evidence of possession of an open container of alcohol was in the car. *See e.g.*, *United States v. Mena-Valdez*, 2021 WL 5985319, at *1 (8th Cir. Dec. 17, 2021); *United States v. McGuire*, 957 F.2d 310, 314(7th Cir. 2001) (non-precedential) ("Once Trooper Newman discovered that McGuire was transporting open, alcoholic liquor in violation of Illinois law, he had probable cause to believe that the car contained additional contraband or evidence." (citation omitted)); *United States v. Howton*, 260 F. App'x 813, 817 (6th Cir. 2008) (non-precedential) (the police officer had probable cause to search for "any other similar contraband" once he discovered there was an open container of alcohol in the vehicle); *see also United States v. Robinson*, 94 F.3d 643 (Table), at *1 (4th Cir. 1996) (per curiam) (unpublished) ("The plain view of the two open alcohol containers, in violation of the law, allowed the officers to search for other open containers because it was reasonable to believe that other contraband might be found within the vehicle.").

Here, before searching the backpack, officers found an open bottle of alcohol in the back seat, observed an open plastic cup in the center console, and when asked whether he had been drinking, Freeman responded that it was from the other day. Additionally, when officers arrived there were a total of three people in close proximity to the vehicle. It was therefore reasonable to believe that a backpack on the floorboard of the driver's seat, where the defendant was standing, could contain more evidence of open container of alcohol, like more plastic cups or other sources

11

of alcohol.  Thus, Officer Hinostroza's search of Freeman's backpack was a lawful search incident to his arrest.

## CONCLUSION

For all the foregoing reasons, and any additional points and authorities cited by the government in the Opposition to the Motion to Suppress, ECF No. 26, at the evidentiary hearing on July 31, 2025, and at the hearing scheduled for August 13, 2025, Freeman's motion to suppress should be denied.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: */s/ John Parron*
    HALEY PENNINGTON
    Special Assistant United States Attorney
    District of Columbia
    IL Bar No. 6349612
    JOHN PARRON
    NY Bar No. 5808522 / PA Bar No. 324503
    601 D Street, NW
    Washington, DC 20530
    202-252-6885
    john.parron@usdoj.gov